Nick Brustin
(New York Bar No. 2844405)
E-mail: nick@nsbcivilrights.com
Anna Benvenutti Hoffmann
(New York Bar No. 4412011)
E-mail: anna@nsbcivilrights.com
Richard Sawyer
(New York Bar No. 5237854)
E-mail: rick@nsbcivilrights.com
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
T: 212-965-9081; F: 212-965-9084
(**Pro Hac Vice** Applications Pending)

Angela Berry (California Bar No. 157379)
Angela Berry, a Prof. Law Corp.
16133 Ventura Blvd Ste 700
Encino, California 91436-2406
T: (866) 285-1529; F: 866-285-1181
E: angela@guardingyourrights.com

Ian Wallach (California Bar No. 237849)
The Law Offices of Ian Wallach, P.C.
11400 West Olympic Boulevard, Ste 1500
Los Angeles, California 90064
T: 213.375.0000; F: 213-402-5516
E: iwallach@wallachlegal.com

Attorneys for Plaintiffs
RUBEN AND MARIA MARTINEZ

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| RUBEN MARTINEZ, and MARIA MARTINEZ, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, ANTHONY RAZO, SALVADOR LIZARRAGA, WILLIAM EAGLESON, and MARILYN DROZ; <br><br> Defendants. | Case No: 2:20-cv-10559 <br><br> **PLAINTIFFS RUBEN MARTINEZ AND MARIA MARTINEZ'S COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Ruben and Maria Martinez, by and through their attorneys, the law firms of Neufeld, Scheck & Brustin, LLP, Angela Barry, a Prof. Law Corp., and the Law Offices of Ian Wallach, P.C., allege as follows:

## INTRODUCTION

1.      Plaintiff Ruben Martinez spent more than 12 years wrongfully imprisoned for crimes he did not commit: a string of five armed robberies between 2005 and 2007 at an Earl Scheib Paint and Body location on South Soto Street in Boyle Heights, Los Angeles. In 2018 and 2019, spurred by a former L.A. County sheriff's deputy convinced of Martinez's innocence, the prosecution conducted a thorough reinvestigation and concluded Martinez was innocent. Los Angeles District Attorney Jackie Lacey admitted "my office not only lost faith in the conviction but also we believe that Mr. Martinez is in fact innocent of the crimes." Based on a motion from the prosecution, the California Superior Court declared him factually innocent.

2.      It is shocking that Martinez was ever convicted given the stark differences between him and the true perpetrator. The actual robber had an intimate knowledge of the layout and operating procedures of the South Soto Earl Scheib, a cash-only, discount auto body shop. Not only did Martinez lack any connection to the South Soto Street location, he never worked at an Earl Scheib anywhere. Unlike the robber, who was missing a front tooth, stood 5'10" or taller, wore his hair medium length, and spoke fluent Spanish, Martinez had all his teeth, was shorter, never had medium-length hair, and could barely speak Spanish. Unsurprisingly, given his innocence, no physical or forensic evidence ever implicated him; the perpetrator's fingerprints, taken at the scene, excluded him. He also had an alibi for each robbery.

3.      Martinez's wrongful conviction was not an accident but rather the result of police misconduct. Defendants, Los Angeles Police Department (LAPD) officers, were desperate for an arrest and became fixated on Martinez by happenstance. To build a case against him despite his innocence, Defendants fabricated false evidence, obtained

false identifications using coercion or suggestion, and buried evidence that exculpated him.

4.     Defendant Anthony Razo is no stranger to fabricating evidence against Latinos. Eight months after Martinez's sentencing, Razo falsified police reports claiming his BMW had been set on fire and two Latinos with shaved heads had shot him in the arm. In fact, as he later admitted in a guilty plea to felony insurance fraud, Razo torched his own BMW for insurance money and shot *himself* in the arm. The "two Latinos with shaved heads" were a complete fabrication.

5.     True to form, Razo and his fellow Defendants fabricated evidence to falsely inculpate Martinez. First, Defendants created a composite sketch that looked remarkably like police photographs of Martinez and used suggestion or coercion to cause two eyewitnesses, who had never seen the perpetrator's face because he had been masked, to adopt the images as truthful representations of their own recollection. Next, Defendants used coercion or suggestion to cause eyewitnesses to make false, tentative identifications of Martinez from photo arrays. Finally, when one witness told the others to identify Martinez at an in-person line-up, Defendants either encouraged this direct suggestion or affirmatively concealed it.

6.     Defendants also suppressed exculpatory evidence from the prosecution, Martinez, and the jury. Among other things, they buried information suggesting that the robberies were an inside job carried out by someone with a close connection to a current or former employee of the South Soto Earl Scheib—information that would have exonerated Martinez, who had no connection to the shop. And they suppressed any evidence that would have shown that the "identifications" of Martinez were caused by improper suggestion or coercion.

7.     During Martinez's first trial, two of the prosecution's key eyewitnesses truthfully admitted that Martinez was not the robber. These admissions, coupled with Martinez's alibi defense and the weakness of the prosecution's case, resulted in a hung jury. The judge declared a mistrial on November 27, 2007.

2

**8.**     At the retrial, Defendants' falsified composite sketch became the key piece of evidence against Martinez. Without knowing it was a complete fabrication, the prosecution argued to the jury that Martinez's resemblance to the sketch proved his guilt. In reality, the sketch resembled Martinez only because of Defendants' misconduct. The jury never learned that the sketch and the purported identifications of Martinez were false and fabricated or that Defendants had used improper coercion or suggestion to obtain them.

**9.**     On April 11, 2008, the innocent Martinez was convicted of nine counts of robbery with personal use of a firearm and was sentenced to forty-seven years and eight months in prison.

**10.**     Defendants' misconduct caused Maria Martinez, Ruben's wife who had testified in support of his alibi, to lose more than 12 years of her husband's companionship.

**11.**     Throughout appeals and post-conviction proceedings, Ruben and Maria Martinez fought ceaselessly to exonerate Ruben. Maria reached out to a former colleague from the L.A. County Sheriff's Department, who became convinced of Ruben's innocence. Their tireless advocacy led the L.A. County District Attorney's Conviction Review Unit (CRU) to reinvestigate and concede Ruben's innocence. On a motion from the prosecution, the L.A. Superior Court vacated Ruben's conviction, dismissed his indictment, and found him factually innocent. Thanks to tireless efforts of himself and his wife, Ruben Martinez was the first person the CRU exonerated without the advocacy of a postconviction attorney. He was released on November 12, 2019, after spending nearly twelve and a half years wrongfully incarcerated for crimes he did not commit.

## VENUE AND JURISDICTION

**12.**     This action is brought pursuant to 42 U.S.C. §§ 1983 *et seq.*, and the Fourth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is

premised on 28 U.S.C. §§ 1331 and 1343(a)(1)-(a)(4), 28 U.S.C. § 1367, and the aforementioned statutory and Constitutional provisions.

13.     Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b) because the events, injuries, and violations of rights alleged herein occurred within the County of Los Angeles, California, which is within this district and because the Defendants, or some of them, reside within the jurisdictional boundaries of this Court.

## PARTIES

14.     Plaintiff **Ruben Martinez** lives in Whittier, California. Martinez was wrongfully incarcerated from his arrest in 2007 until his release in 2019.

15.     Plaintiff **Maria Martinez** lives in Whittier, California. She was deprived the company of her husband, Plaintiff Ruben Martinez, during his wrongful incarceration.

16.     Defendant **City of Los Angeles** is a municipality incorporated in the State of California. The City of Los Angeles was responsible for the training, supervision, and discipline of individual Defendants and for the policies and practices regarding police investigations that were used in this case.

17.     At all relevant times, Defendant **Anthony Razo** was employed by the Los Angeles Police Department ("LAPD"), acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of City of Los Angeles and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

18.     At all relevant times, Defendant **Salvador Lizarraga** was employed by the LAPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of City of Los Angeles and the State of California. Upon information and belief,

he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

19.    At all relevant times, Defendant **William Eagleson** was employed by the LAPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of City of Los Angeles and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

20.    At all relevant times, Defendant **Marilyn Droz** was employed as a contractor by the LAPD, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of City of Los Angeles and the State of California. Upon information and belief, she is entitled to indemnification under statute and by contract. She is sued in her individual capacity.

## FACTS

### The Robberies

21.    On December 29, 2005, at around 5:20 p.m., a heavy-set Hispanic man with a missing top front tooth, medium-length hair parted down the middle, and a mustache robbed an Earl Scheib Paint and Body, one of a chain of cash-only discount body shops, on South Soto Street in Boyle Heights, Los Angeles. The perpetrator demonstrated inside knowledge of the layout and operations of the South Soto location. Juan Carlos Rodriguez, the manager and sole eyewitness, described the perpetrator's face in detail to the police.

22.    Exactly one year later—on December 29, 2006—the assailant returned and robbed the South Soto Earl Scheib for a second time. During that robbery, the assailant concealed his face under a sock-like painter's mask, like the ones worn by painters at the Earl Scheib. The mask covered everything but the robber's eyes and the bridge of his nose.

**23.**    Although the robber's face was obscured by the mask, Rodriguez recognized him as the same robber from a year earlier—he had the same clothes, stature, demeanor, mannerisms, and inside knowledge of the South Soto Earl Scheib. After the robbery, Rodriguez described the robber's face, which he had not seen in a year, and inaccurately told police that the robber had a gap in his front teeth, not that he was *missing* a tooth.

**24.**    The same assailant robbed the South Soto Earl Scheib three more times within the next year: on March 9, May 18, and May 31, 2007. During each of these robberies, the robber concealed his face and hair. During the third and fourth robberies, he wore the same sock-like painter's mask that covered everything below the bridge of his nose and above his eyebrows. During the fifth robbery, he wore a hat and red bandana that concealed all but his eyes.

**25.**    Although there were multiple witnesses present for these last four robberies, none saw the robber's face. Only Rodriguez, who saw the perpetrator during the first robbery, ever saw him unmasked.

**26.**    Yet, it was clear to the victims that the same perpetrator committed every robbery. While they could not recognize his face, employees recognized him by his build, clothes, voice, and familiarity with the South Soto Earl Scheib.

**27.**    The perpetrator seemed to know the Earl Scheib like the back of his hand. He knew where the safe was located and the dates and times when the location was likely to have the most cash on hand—payday, when employees routinely cashed their paychecks out from the safe.  The perpetrator also knew that the auto body painter at the Earl Scheib was paid more relative to other employees, knew where he was stationed, and specifically sought him out during the robberies.

### **Martinez becomes a suspect after Defendants' investigation stalls.**

**28.**    By the third robbery, on March 9, Defendants had heard from witnesses that the perpetrator had an inside connection to this Earl Scheib, given his familiarity

with the store's layout and operations. Despite this information, Defendants had not identified a suspect and faced mounting pressure to stop the string of robberies.

29.     Two days after the third robbery, police arrested Ruben Martinez in an unrelated incident when they swept up all the Latino men in his building while chasing a shoplifter. Despite Martinez's lack of involvement in the shoplifting, an officer interviewed him while he was detained.

30.     An officer noticed that Martinez had physical characteristics that fit the police's theory of the "Earl Scheib bandit." Although Martinez had all of his teeth, short hair, and was shorter than the real perpetrator, he was Latino, heavyset, mustached, and had a noticeable gap tooth—loosely fitting the second description Rodriguez had given of the robber.

31.     The officer also reported that Martinez had worked at an auto body shop for ten years, a fact superficially consistent with the theory that the robber worked at the Earl Scheib. But Martinez had never worked at an Earl Scheib, let alone the South Soto location. He had worked off-and-on for a high-end auto body shop in Pomona many years before his interrogation but was employed by a metal manufacturer as a temporary unskilled laborer at the time of his arrest.

32.     Martinez had recently gotten married to his deeply religious wife, Maria, and had settled into family life. He had a steady stream of temporary employment and was well-liked by his colleagues and supervisors. He did not own a car and commuted to and from work each day by bus or carpool. He was at work during many of the daytime robberies and has time records proving it.

33.     But, desperate to close the investigation, Defendants built a false case against Martinez based on the superficial similarities, real or imagined, he shared with the perpetrator.

PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

**Defendants use coercion and suggestion to create a fabricated composite sketch that strongly resembles Martinez.**

**34.**     Defendants Razo, Eagleson, and Lizarraga worked together to close the two-year investigation of the Earl Scheib robberies. Eagleson was the detective in charge of the case; Razo and Lizarraga did much of the legwork, including preparing and showing photo arrays, obtaining the arrest warrant, and searching Martinez's home. Lizarraga and Eagleson co-drafted the comprehensive final report of the investigation.

**35.**     Razo was comfortable with fabricating criminal allegations against Latinos and lying in police reports. Months after Martinez's conviction, Razo set his own BMW on fire for insurance money and falsified police and insurance reports to pay off his debts. Later that month, Razo shot himself in the arm and falsely reported to the police that "two Latinos with shaved heads" had done it.

**36.**     Charged with five felony counts, Razo pleaded guilty to felony insurance fraud and a misdemeanor count of filing a false police report. He admitted that he had set his own BMW on fire and shot himself—the "two Latinos with shaved heads" were a complete fabrication.

**37.**     Following this playbook, Razo and his colleagues fabricated police reports and other inculpatory evidence and suppressed exculpatory evidence to build a false case against Martinez.

**38.**     In April 2007, Defendant Marilyn Droz, a sketch artist, created a composite sketch that bore a striking resemblance to police photographs of Martinez's face and mouth—including his mustache and gap tooth.

**39.**     Droz and Defendants Lizarraga and Eagleson falsely reported that the sketch was based on descriptions given by Earl Scheib employees William Hernandez and Pedro Sanchez. But Hernandez and Sanchez never saw the perpetrator's face, could not describe it, and had told the police that the perpetrator wore a sock-like painter's hood that covered all but his eyes and the bridge of the nose. Nonetheless, the composite sketch purported to depict perpetrator's full face—including his nose,

mustache, and mouth—in a hood that covered only the ears and hair. The composite included an inset drawing of lips, a mustache, and a gap-tooth.

40.     In ordinary police practice in 2007, police artists drafted their sketches with Identikit, a standardized set of pre-drawn facial features, or a similar product. A witness would generally describe a suspect's facial features, and the sketch artist would assemble those features from pre-drawn examples. The sketch artist would then tweak the composite so it looked more like the witness's recollection of the suspect's face and less like an assemblage of generic facial features. On information and belief, this was the standard practice of LAPD sketch artists in 2007.

41.     Here, Droz broke from that standard practice and drew the purported sketch of the Earl Scheib bandit from individual photographs, not an Identikit. She and other Defendants showed those photographs to Hernandez and Sanchez. The resulting sketch closely tracked photographs that police had of Martinez.

42.     The resemblance was no accident but the result of police misconduct. Either Droz or other Defendants used coercion or suggestion to cause the witnesses to describe the perpetrator based on photos of Hernandez, or Droz simply based her "composite" on photos of Martinez and Defendants used coercion or suggestion to cause the witnesses to adopt it as their own work.

43.     Hernandez, in particular, was susceptible to police influence. Defendants were investigating him as a suspect in the Earl Scheib robberies and, upon information and belief, used their suspicions as leverage to cause him to falsely identify Martinez.

44.     In written and oral reports to the prosecution, Defendants deliberately misrepresented that Sanchez and Hernandez independently and separately contributed to the composite drawing. Defendants affirmatively concealed their misconduct from the prosecution by deliberately omitting the facts that the drawing was based on photographs of Martinez.

**After a fourth robbery, Defendants fabricate identifications of Martinez through coercion and suggestion in photo line-ups.**

45.     On May 23, five days after the fourth robbery, Defendants Razo and Lizarraga showed photo arrays to at least three witnesses—Hernandez, Sanchez, and Edward Mendez. None of those witnesses ever saw more than the robber's eyes and could not identify him by his face. Nevertheless, Razo and Lizarraga reported that all three witnesses tentatively identified Martinez—the innocent person police already suspected—from a close-up photograph of his face, without suggestion or prompting of any kind from them.

46.     In reality, Defendants Razo and Lizarraga caused these false tentative identifications through coercion or suggestion and falsely reported that these identifications were proper, suppressing any mention of their misconduct.

47.     Defendants recognized that the tentative identifications were insufficient to satisfy the probable cause requirement needed to arrest Martinez. Consequently, Defendant Eagleson and other Defendants traveled to Rodriguez's house to get Rodriguez to make a positive identification of Martinez. Rodriguez, like Hernandez, Sanchez, and Mendez, succumbed to police suggestion or coercion and made a false, tentative identification of Martinez. Defendants Eagleson, Lizarraga, and Razo fabricated written and oral reports to the prosecution claiming that Rodriguez made this tentative identification on his own and deliberately suppressed any evidence of police coercion or suggestion.

**Following the fifth robbery, Defendants use suggestion and coercion to cause Rodriguez to make a false, positive identification.**

48.     On May 31, shortly after the fifth robbery, Defendant Eagleson and other Defendants returned to Rodriguez with a new photo array. Using suggestion, coercion,

or other impermissible tactics, Eagleson improperly steered Rodriguez toward Martinez's photo, and Rodriguez incorrectly identified Martinez as the robber.

49.     Eagleson improperly bolstered Rodriguez's identification of Martinez by telling him, falsely, that Martinez had been arrested for the recent robbery of a neighboring check-cashing business. Eagleson's additional suggestion improperly increased Rodriguez's confidence in his false identification.

50.     Eagleson met frequently with Rodriguez during the ensuing months to reinforce the false identification, repeatedly telling Rodriguez that he had picked the right suspect. During trial, Eagleson drove Rodriguez to court and continued to improperly influence him by telling him he had picked the right suspect.

51.     Eagleson falsely reported in written and oral reports to the prosecution that Rodriguez had identified Martinez spontaneously without police suggestion. He intentionally suppressed evidence that the identification was, in fact, the product of police coercion and suggestion and deliberately suppressed the fact that he improperly bolstered Rodriguez's identification by falsely telling him that Martinez had robbed the check-cashing store.

### Now armed with fabricated evidence as probable cause, Defendants arrest Martinez for crimes he did not commit.

52.     Based solely on Rodriguez's false identification and other fabricated evidence, Defendants arrested Martinez on June 1, 2007, and searched his house. Defendants found no incriminating evidence in his house because there was none—Martinez had nothing to do with the Earl Scheib robberies.

### Defendants encourage or condone direct suggestion during an in-person line-up.

53.     With Martinez in custody, Defendants conducted an in-person line-up with at least seven current and former Earl Scheib employees who witnessed the robberies. Mendez, the Earl Scheib manager who replaced Rodriguez, refused to attend. He said

that he wouldn't be able to identify the robber because he never saw the perpetrator's face.

54.    Common police practice in 2007 required witnesses to be kept separate during line-up procedures so that they would not improperly influence each other. Defendants, however, kept all of the witnesses together in one room, allowing them to talk to each other while the line-up took place in a separate room. On information and belief, those defendants included Razo and Eagleson.

55.    Rodriguez had earlier identified Martinez due to police suggestion, and his "identification" had repeatedly been reinforced by Eagleson, who improperly and falsely told him that Martinez had committed other robberies. Through this and other suggestion by Defendants, Rodriguez misidentified Martinez as the robber.

56.    Afterward, Defendants sent Rodriguez to rejoin the other witnesses, and he told them to pick Martinez, describing his appearance. Defendants either deliberately instructed Rodriguez to tell the other witnesses to identify Martinez or were aware that he did so and did nothing to stop him. Defendants did not document anywhere that Rodriguez told the other witnesses which suspect to pick.

57.    Two other witnesses, Pedro Sanchez and Chris Devora, succumbed to improper suggestion by both Rodriguez and Defendants and incorrectly identified Martinez as the robber. Neither witness had ever seen the robber's face and only identified Martinez because Rodriguez and the police told them which suspect to select. Defendants affirmatively concealed this misconduct from the prosecution.

58.    Despite improper suggestion from Rodriguez and Defendants, however, most of the witnesses refused to falsely identify Martinez. Of the seven or more witnesses to view the in-person line-up, only three made identifications. William Hernandez, who had participated in the false composite sketch of Martinez and had purportedly identified Martinez from a photo array, truthfully denied recognizing the robber.

**Defendants suppress exculpatory evidence.**

**59.**    Defendants also suppressed exculpatory evidence that would have undermined the prosecution of Martinez.

**60.**    During each robbery, the perpetrator showed an uncanny knowledge of the South Soto Earl Scheib's layout and operations. He timed the robberies to coincide with the Earl Scheib payroll dates knowing that the shop kept additional cash on hand because most employees cashed their paychecks out from the safe. The robber also knew that the shop's painter made more money than the other employees and individually sought him out during the robberies. The perpetrator knew where the safe was kept and where the employees, including the higher-paid painter, were assigned to work. Because of this apparent inside knowledge, the witnesses believed the robberies were an inside job, committed by someone with close ties to a former or current employee of this branch.

**61.**    Witnesses reported their suspicions to Defendants, and Defendants began investigating Hernandez as a possible suspect. The investigation was abandoned, however, after Defendants built the false case against Martinez, who had no ties to the South Soto Earl Scheib or any other location. The police file omits any mention of the crime being an inside job or of the investigation of Hernandez. Defendants deliberately suppressed this information from written and oral reports to the prosecution to avoid detracting from the case against Martinez.

**62.**    Also missing from the police file is any record of running a license plate number taken by witnesses from the perpetrator's vehicle. In 2007, it was common practice in the LAPD to run suspect license plates, and the task could be accomplished by computer in a matter of seconds. But because Martinez did not own a car—and, more importantly, had no involvement in the Earl Scheib robberies—the suspect license plate could not be connected to him. Rather than reporting the exculpatory results of the license plate check, however, Defendants did not include them anywhere in the police file.

**<u>Despite the introduction of falsified identifications, the first trial ends in a hung jury.</u>**

**63.**     Despite Defendants' investigative misconduct, the evidence at the first trial strongly suggested his innocence. No physical or forensic evidence implicated Martinez. Of the eleven or more robbery victims, only five were asked to identify Martinez, and two of those witnesses denied that he was the perpetrator. Hernandez, the only witness present for four of the five robberies, truthfully testified that the perpetrator had a different height and build than Martinez. Earl Scheib manager Eddie Mendez agreed, testifying that the perpetrator was taller than Martinez.

**64.**     Martinez presented a vigorous defense, including credible evidence of his alibi through the testimony of his former employers and his wife, Maria.

**65.**     The only evidence of Martinez's guilt was the "identifications" from Rodriguez, Sanchez, and Devora, who, unknown to the prosecution, defense, or jury, had each identified Martinez through police suggestion or coercion.

**66.**     Hernandez and Mendez's admissions that Martinez was not the perpetrator, coupled with the lack of physical evidence and the strength of Martinez's alibis, caused the jury to hang. On November 27, 2007, the judge declared a mistrial.

**<u>Defendants' misconduct causes Martinez's conviction at his re-trial.</u>**

**67.**     At the retrial, Defendants' false and fabricated evidence tipped the scales against Martinez. In place of Hernandez, who exculpated Martinez in the first trial, the case hinged on the fabricated composite sketch Defendants had falsely attributed to Hernandez. Unaware that Defendants had improperly influenced the sketch to make it resemble their then suspect, Martinez, the prosecution presented the sketch as the work of eyewitnesses, arguing that Martinez's resemblance to it proved his guilt. Based on Defendants' fabrications, the jury believed that it had been drawn using descriptions from Hernandez and Sanchez.

**68.**     The tentative identifications obtained by Defendants through suggestion and coercion were also used at trial. The reliability of Sanchez's supposed identification

of Martinez was bolstered by the police report claiming that he tentatively identified Martinez from a photo array. Mendez, who testified at the first trial that Martinez was not the perpetrator, was examined at the second trial about his purported tentative photo-array identification. The prosecution was unaware, nor did the jury ever learn, that those "identifications" were caused by improper suggestion or coercion.

69.     The only other evidence of Martinez's guilt were the three false and fabricated "identifications" from Rodriguez, Sanchez, and Devora. But each of these witnesses had only identified Martinez based on undisclosed suggestion or coercion.

70.     Martinez again maintained his innocence and presented evidence from two former supervisors, his wife Maria, and another family member supporting his alibi.

71.     Nevertheless, on April 11, 2008, the jury convicted Martinez on the basis of the Defendants' fabricated composite sketch, the fabricated identifications from the photo and physical line-ups, and the in-court identifications. Neither the defense nor the jury ever learned that the falsified "identifications" were the product of police misconduct and that none of the witnesses had actually provided genuine, unsuggested, and uncoerced identifications of Martinez. Nor did the jury learn that the real perpetrator had an inside connection to Earl Scheib or that Defendants had affirmatively buried that lead from the prosecution and defense once they fixated on Martinez as a suspect.

72.     Despite his innocence, on May 20, 2008, Ruben Martinez was sentenced to serve forty-seven years and eight months in prison.

### Martinez fights for 11 years to prove his innocence, and the CRU finally reinvestigates and exonerates him.

73.     Martinez spent the next 11 years fighting to prove his innocence. He brought direct appeals and collateral challenges in both state and federal courts. All of his applications were denied.

74.     Though Martinez remained in prison, he had a powerful advocate outside its walls—his wife, Maria. Maria convinced her former colleague, Catherine Wills, a

retired deputy sheriff with the L.A. County Sheriff's Department, of Ruben's innocence.

**75.**     Together, Wills and Maria compiled a thick binder of evidence exonerating Ruben and passed it on to the L.A. County prosecutor's newly established CRU.

**76.**     The CRU conducted its own reinvestigation and gathered yet more proof that Martinez was wrongfully convicted. The CRU interviewed Martinez's former employers and colleagues and uncovered documentary evidence, including timecards and paystubs, that definitively proved Martinez's alibi.

**77.**      Based on this evidence, the CRU concluded that Martinez was actually innocent, and, on November 1, 2019, the prosecution moved to vacate Martinez's conviction, admitting that it "not only lost faith in his conviction but also was convinced Mr. Martinez is, in fact, innocent of the crimes."

**78.**     The District Attorney continued to say that "Mr. Martinez's case serves as a stark reminder to all of us: Despite our best efforts, we don't always get it right."

**79.**     On November 12, 2019, L.A. County Superior Court Judge William Ryan vacated Mr. Martinez's conviction, dismissed his case with prejudice, and found him factually innocent of the crimes for which he was convicted. On that day, for the first time in more than 12 years, Martinez walked free.

## DAMAGES

**80.**     Plaintiff Ruben Martinez lost more than 12 years of his life incarcerated for a crime he did not commit. He spent that time separated from his wife, Plaintiff Maria Martinez. Both Plaintiffs lost more than 12 years of spousal love, support, and physical intimacy. They must now restart their life together despite the unimaginable experience of wrongful incarceration.

**81.**     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Martinez sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 12 years; physical pain and suffering; severe mental anguish;

emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

82.    Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, Martinez was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Among other losses, Martinez was separated from his loving wife, Maria, after only five months' marriage. When they married, Ruben was 37 and Maria was 46. When Ruben was freed, he was 49 and Maria was 59. Martinez was also unable to visit his mother as she passed away and could not attend her funeral. He also lost three uncles and a 14-year-old nephew during his incarceration and could not attend their funerals either. He missed his sister's wedding and numerous family births. Martinez also missed out on the ability to share holidays and other life events with loved ones, the opportunity to spend time with his new wife, to have a family, and the fundamental freedom to live one's life as an autonomous human being.

83.    Maria Martinez, likewise, was wrongfully deprived of the company and support of her husband during his more than 12 years of wrongful incarceration. During that time, she could not share her most important life experiences, including holidays, births, funerals, and other life events, with her beloved husband. She suffered persistent anxiety and panic attacks, causing her significant distress and lost time at work. She was also deprived of his financial support while he was incarcerated and unable to work.

## **FEDERAL CLAIMS**

### **COUNT I**

### **42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial Under the Fourteenth Amendment Based on Fabrication of False Evidence Against Defendants Razo, Eagleson, Lizarraga, and Droz**

**84.** Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

**85.** Defendants fabricated false evidence of Martinez's guilt, thereby violating Martinez's right to a fair trial and causing him to be deprived of his liberty without due process of law. Defendants caused this false evidence to be used against Martinez in his prosecution and at trial and failed to disclose to either the prosecution or defense that this evidence was false and fabricated.

**86.** Among this fabricated evidence was a composite sketch created by Droz that closely resembled police photos of Martinez. Droz, Lizarraga, and Eagleson falsely attributed the composite to descriptions given spontaneously and without police misconduct by two eyewitnesses. In fact, Defendants had used coercion or suggestion to cause the witnesses to adopt the composite sketch as their own work. In a written report, Lizarraga and Eagleson falsely stated that the composite sketch was created from witness descriptions, not photographs of Martinez.

**87.** Defendants also obtained false and fabricated tentative eyewitness identifications through suggestion, coercion, or other improper means:

a.      Defendants including Razo, Eagleson, and Lizarraga used suggestion or coercion to cause Rodriguez, Hernandez, Mendez, and Sanchez to make tentative identifications of Martinez from a photo array.

b.      Defendants including Eagleson used suggestion or coercion to cause Rodriguez to make a positive identification of Martinez from a photo array and improperly bolstered Rodriguez's identification by falsely telling him that Martinez had

been involved in other robberies, including the recent robbery of a neighboring check-cashing store.

          c.      Defendants including Razo, Eagleson, Lizarraga, or others fabricated three false identifications of Martinez from a live line-up from Rodriguez, Sanchez, and Devora. Defendants either instructed Rodriguez to tell Sanchez and Devora which suspect to pick from the line-up or were aware that he did so and took no action to stop the ensuing false identifications.

**88.**    The criminal case against Martinez was weak, and the only evidence against him was the foregoing false evidence fabricated by Defendants. Had evidence of Defendants' misconduct been disclosed, it would have cast doubt on the only evidence presented as to Martinez's guilt, would have been used at trial to impeach Defendants and other witnesses, and would have demonstrated the invalidity of Defendants' entire investigation. Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Martinez's defense. In consequence, without the false evidence that Defendants fabricated, or had Defendants' misconduct been disclosed, Martinez's trial would most likely have had a different result.

**89.**    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to Martinez's federally protected constitutional rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the City of Los Angeles and under color of state law. No reasonable officer would have believed this conduct was lawful in 2007 and 2008.

**90.**    As a direct and proximate result of Defendants' actions, Martinez was wrongly arrested, detained, and charged with armed robbery with special allegations; prosecuted, convicted, and sentenced to forty-seven years and eight months in prison; incarcerated for more than 12 years, and suffered the other grievous injuries and damages set forth above.

1

**COUNT II**

2

**42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law**

3

**and Violation of Right to a Fair Trial Under the Fourteenth Amendment Based on Withholding Material Exculpatory and Impeachment Evidence Against**

4

**Defendants Razo, Eagleson, Lizarraga, and Droz**

5

**91.** Plaintiff hereby incorporates each of the allegations of this Complaint as if

6

fully set forth herein, and further alleges as follows:

7

**92.** Defendants Razo, Eagleson, Lizarraga, and Droz deprived Martinez of his

8

right to a fair trial by withholding material exculpatory and impeachment evidence from

9

prosecutors and the defense in violation of the Constitution and *Brady v. Maryland*, 373

10

U.S. 83 (1963) and its progeny.

11

**93.** Defendants Razo, Eagleson, Lizarraga, and Droz either directly

12

participated or knew about the fabrication of false inculpatory evidence and

13

concealment of exculpatory evidence described herein and intentionally failed to

14

disclose it to prosecutors and the defense. Defendants' misconduct in withholding

15

material exculpatory and impeachment evidence included but is not limited to:

16

a. Withholding from prosecutors and the defense information that the

17

Earl Scheib robberies were an inside job perpetrated by a disgruntled employee or with

18

the assistance of a current employee;

19

b. Withholding from prosecutors and the defense information that

20

Razo, Eagleson, and Lizarraga had investigated Hernandez as the perpetrator of the

21

crimes;

22

c. Withholding from prosecutors and the defense the true

23

circumstances of the drafting of the composite sketch and falsely reported that it was

24

based on descriptions from Hernandez and Sanchez;

25

d. Withholding from prosecutors and the defense that Razo, Eagleson,

26

and Lizarraga had used suggestion or coercion to cause Hernandez, Sanchez, Mendez,

27

and Rodriguez to make tentative identifications of Martinez from a photo array;

28

e.      Withholding from prosecutors and the defense that Eagleson had used suggestion or coercion to cause Rodriguez to make a false identification of Martinez from a second photo array and that Eagleson had improperly bolstered that identification by falsely telling Rodriguez that Martinez had committed other robberies;

f.      Withholding from prosecutors and the defense that Eagleson, Razo, or Lizarraga used suggestion or coercion to cause Rodriguez to falsely identify Martinez from a line-up;

g.      Withholding from prosecutors and the defense that the witnesses had been kept in the same room and allowed to communicate during the in-person line-up and that Rodriguez had told them which suspect to choose, either based on instructions from Eagleson, Razo, or Lizarraga, or with their knowledge and consent; and

h.      Withholding evidence of Defendants' misconduct throughout the investigation, which undermined their credibility and the reliability of the investigation as a whole.

94.     The criminal case against Martinez was weak, and the only evidence against him was the false evidence fabricated by Defendants. Had any of this suppressed exculpatory or impeachment evidence been disclosed, Martinez would never have been wrongly convicted.

95.     The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to Martinez's federally protected constitutional rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the City of Los Angeles and under color of state law. No reasonable officer in 2007 and 2008 would have believed the foregoing conduct was lawful.

96.     As a direct and proximate result of Defendants' actions, Martinez was wrongly arrested, detained, and charged with armed robbery; prosecuted, convicted, and

sentenced to forty-seven years and eight months in prison; incarcerated for more than 12 years, and suffered the other grievous injuries and damages set forth above.

## COUNT III

**42 U.S.C. § 1983 Claim for Malicious Prosecution and Violation of the Fourth and Fourteenth Amendments Against Defendants Razo, Eagleson, Lizarraga, and Droz**

97.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

98.     Defendants Razo, Eagleson, Lizarraga, and Droz caused criminal proceedings to be brought against Martinez without probable cause and without any reasonable belief in guilt. Martinez is completely innocent of the Earl Scheib robberies. As Defendants knew, the sole basis for the criminal action against Martinez was the false evidence that Defendants fabricated. No reasonable officer in 2007 or 2008 would have believed that fabricated evidence provided probable cause to arrest, and no reasonable officer in 2007 or 2008 would have believed that an arrest without probable cause was justified.

99.     Defendants also continued the prosecution against Martinez on the basis of this false and fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby subjecting Martinez to an ongoing seizure in violation of the Fourth and Fourteenth Amendments.

100.    The criminal proceedings against Martinez were initiated with malice. Defendants Razo, Eagleson, Lizarraga, and Droz caused the charges against Martinez to be filed by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation of the legal proceedings against Martinez when they knew there was no probable cause.

101.    Defendants initiated the action against Martinez for the purpose of denying Martinez's constitutional rights, including his right to be free from unreasonable

searches and seizures, and his right to not be deprived of liberty without due process of law.

**102.**   As a direct and proximate result of Defendants' actions, Martinez was wrongly arrested, detained, and charged with armed robbery; prosecuted, convicted, and sentenced to forty-seven years and eight months in prison; incarcerated for more than 12 years, and suffered the other grievous injuries and damages set forth above.

**103.**   The criminal proceedings against Martinez terminated in his favor. The prosecution conceded Martinez's innocence and moved to vacate his conviction and dismiss the indictment. On November 12, 2019, the Superior Court dismissed all charges against Martinez and found that he was factually innocent of the crimes.

**COUNT IV**

**42 U.S.C. § 1983 Civil Rights Conspiracy Claim Against Defendants Razo, Eagleson, Lizarraga, and Droz**

**104.**   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

**105.**   Defendants Razo, Eagleson, Lizarraga, Droz, and others yet unknown agreed among themselves and others, including Juan Carlos Rodriguez, to act in concert to deprive Martinez of his clearly established constitutional rights as protected by the Fourth and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law and to be free from illegal seizure.

**106.**   As described in detail above, in furtherance of the conspiracy, Defendants Razo, Eagleson, Lizarraga, Droz, and others, including Rodriguez, engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to, the following misconduct:

a.      Defendants, including but not limited to Razo, Eagleson, Lizarraga, and Droz acted in concert to fabricate a composite sketch drawn from a photograph of Martinez and falsely attributed to two eyewitnesses;

b.      Defendants, including but not limited to Razo, Eagleson, and Lizarraga, acted in concert to fabricate false tentative or positive eyewitness identifications of Martinez from Rodriguez, Hernandez, Mendez, Sanchez, and Devora using suggestion or coercion. They also acted in concert to fabricate police reports falsely representing that these identifications were made immediately and unequivocally when, in fact, none of the witnesses made an identification without unlawful suggestion;

c.      Defendants, including but not limited to Eagleson, Razo, and Lizarraga, acted in concert with Rodriguez to suggest to other witnesses that Martinez was guilty and that they should identify him during the in-person line-up; and

d.      Defendants, including but not limited to Razo, Eagleson, and Lizarraga, acted in concert to suppress evidence that the Earl Scheib robberies were an inside job perpetrated by a disgruntled former employee or with the help of a current employee. They also worked in concert to suppress evidence that Hernandez had been investigated as a suspect.

107.   No reasonable officer in 2007 or 2008 would have believed this conduct was lawful. As a direct and proximate result of Defendants' actions, Martinez was wrongly arrested, detained, and charged with armed robbery; prosecuted, convicted, and sentenced to forty-seven years and eight months in prison; incarcerated for more than 12 years, and suffered the other grievous injuries and damages set forth above.

## COUNT V
## 42 U.S.C. § 1983 Failure to Intervene Against Defendants Razo, Eagleson, Lizarraga, and Droz

108.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

109.   By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Martinez to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so. No reasonable officer in 2007 or

2008 would have believed this conduct was lawful. Defendants' failures included but are not limited to:

a.   Failing to intervene to prevent or stop the fabrication of a false composite sketch of Martinez drawn from a photograph and falsely attributed to descriptions by two eyewitnesses;

b.   Failing to intervene to prevent or stop the fabrication of eyewitness identifications;

c.   Failing to intervene to prevent or stop the suggestion or coercion used to obtain those identifications;

d.   Failing to intervene to prevent or stop the fabrication of reports on those false and fabricated eyewitness identifications; and

e.   Failing to intervene to prevent or stop the concealment and suppression of exculpatory evidence.

110.   These Defendants' failures to intervene violated Martinez's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable officer or investigator in 2007 or 2008 would have believed that failing to intervene to prevent Defendants from fabricating inculpatory evidence, concealing and withholding exculpatory evidence, or causing Martinez to be arrested and prosecuted without probable cause, were lawful.

111.   These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Martinez's injuries. Defendants knew, or should have known, that their conduct would result in Martinez's wrongful arrest, prosecution, conviction, and incarceration.

112.   As a direct and proximate result of Defendants' failure to intervene, Martinez was wrongly arrested, detained, and charged with armed robbery; prosecuted, convicted, and sentenced to forty-seven years and eight months in prison; incarcerated

for more than 12 years, and suffered the other grievous injuries and damages set forth above.

## CALIFORNIA LAW CLAIMS

### COUNT VI
### Claim Under California State Law on Behalf of Both Ruben and Maria Martinez for Loss of Consortium Against Defendants Razo, Eagleson, Lizarraga, and Droz

**113.**   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

**114.**   Ruben and Maria Martinez had been married only five months before Defendants caused Ruben to be wrongfully arrested for the Earl Scheib robberies— crimes he did not commit. Ruben and Maria Martinez remained married after his arrest and to this day.

**115.**   Defendants, through negligence or intentional misconduct caused Ruben to be wrongfully prosecuted for crimes he did not commit. Defendants fabricated evidence and suppressed exculpatory evidence causing Ruben to be incarcerated for more than 12 years. Had it not been for Defendants' negligence or intentional misconduct, Ruben would not have been incarcerated for that period of time.

**116.**   During Ruben's more than 12-year-long incarceration, both Ruben and Maria lost the consortium of one another. Although newlywed, they were unable to live together as spouses and enjoy each other's emotional support and companionship. Defendants' misconduct proximately caused this loss.

**117.**   On December 17, 2019, Ruben Martinez submitted a claim for damages to the City of Los Angeles under California Government Code § 910. On January 3, 2020, Maria Martinez submitted a claim for damages to the City of Los Angeles under California Government Code § 910. The City of Los Angeles did not provide written notice rejecting either claim under California Government Code § 913. Forty-five days have elapsed since Ruben and Maria Martinez submitted their claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VIII

### Claim Under California State Law, Cal. Gov. Code § 815.2, for Respondent Superior and Vicarious Liability Against the City of Los Angeles

**118.** Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

**119.** Martinez suffered the aforementioned injuries as a proximate result of the misconduct of the individual Defendants.

**120.** During all relevant times, Defendants were employees or contractors of the Los Angeles Police Department and the City of Los Angeles.

**121.** Defendants' tortious conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

**122.** The acts and omissions of Defendants that proximately caused Martinez's injuries were within the scope of Defendants' employment with the Los Angeles Police Department and the City of Los Angeles.

**123.** On December 17, 2019, Ruben Martinez submitted a claim for damages to the City of Los Angeles under California Government Code § 910. On January 3, 2020, Maria Martinez submitted a claim for damages to the City of Los Angeles under California Government Code § 910. The City of Los Angeles did not provide written notice rejecting either claim under California Government Code § 913. Forty-five days have elapsed since Ruben and Maria Martinez submitted their claims.

## COUNT IX

### Claim Under California State Law, Cal. Gov. Code § 825, Against City of Los Angeles

**124.** Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

125.   California law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

126.   At all relevant times, the Defendants were employees or contractors of the City of Los Angeles Police Department and the City of Los Angeles who acted within the scope of their employment in committing the misconduct described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Martinez demands judgment jointly and severally against Defendants as follows:

**A**.    That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial but that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this action;

**B**.    That the Court award punitive damages to him, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

**C**.    For a trial by jury;

**D**.    For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

**E**.    For any and all other relief to which he may be entitled.

DATED:  November 19, 2020                    The Law Offices of Ian Wallach, P.C.


By:  *Ian Wallach*
_____
IAN WALLACH
Attorneys for Plaintiffs
RUBEN & MARIA MARTINEZ

DATED:  November 19, 2020                     Angela Berry, a Prof. Law Corp.


                                              By:  *Angela Berry*
                                                   ANGELA BERRY
                                                   Attorneys for Plaintiffs
                                                   RUBEN & MARIA MARTINEZ


## JURY DEMAND

     **1.**    Pursuant to the Seventh Amendment of the United States Constitution, Martinez requests a jury trial on all issues and claims set forth in this Complaint.

DATED:  November 19, 2020                     The Law Offices of Ian Wallach, P.C.


                                              By:  *Ian Wallach*
                                                   IAN WALLACH
                                                   Attorneys for Plaintiffs
                                                   RUBEN & MARIA MARTINEZ


DATED:  November 19, 2020                     Angela Berry, a Prof. Law Corp.


                                              By:  *Angela Berry*
                                                   ANGELA BERRY
                                                   Attorneys for Plaintiffs
                                                   RUBEN & MARIA MARTINEZ